STATE OF MINNESOTA

IN SUPREME COURT

ADM09-8009

FILED

August 12, 2015

OFFICE OF
APPELLATE COURTS



**ORDER PROMULGATING AMENDMENTS TO THE
MINNESOTA GENERAL RULES OF PRACTICE**

The Supreme Court Advisory Committee on the Rules of Criminal Procedure ("the Committee") recommended amendments to Rule 4 of the General Rules of Practice to authorize a pilot project that would permit, without the consent of the parties, limited audio and video coverage of certain criminal trial court proceedings. Currently, the General Rules permit audio and video coverage of criminal proceedings only with the consent of all parties and by court order. Minn. Gen. R. Prac. 4.02(c). As proposed by the Committee, the pilot project would allow audio and video coverage of proceedings, such as sentencing, that occur after a guilty verdict has been returned or a guilty plea has been tendered.

The Committee filed its report and recommendations on July 29, 2014. On September 19, 2014, the Court opened a public comment period and scheduled a public hearing for December 16, 2014. Written comments were submitted by 19 organizations and individuals. Nine individuals spoke at the December 16 hearing, including the Chair of the Committee; representatives of the Hennepin County Attorney's Office, the Dakota County Attorney's Office, and the Suburban Hennepin County Prosecutors Association; representatives of media organizations; representatives of the Criminal Law Section of

the State Bar Association and criminal defense attorneys including public defenders; and representatives of the Minnesota Coalition against Sexual Assault and the Judicial Branch Committee for Equality and Justice.

The court has considered the oral and written comments, along with the proposed format of the pilot project. After careful review, the court has determined that a pilot project should proceed, but only with restrictions on the cases and proceedings in which coverage shall be permitted, and with additional safeguards and conditions to govern that coverage. Based on all of the files, records, and proceedings herein,

IT IS HEREBY ORDERED THAT:

1.      The attached amendments to the General Rules of Practice be, and the same are, prescribed and promulgated to be effective as of November 10, 2015.

2.      The Advisory Committee on the Rules of Criminal Procedure is directed to work with the State Court Administrator or his designee, and the media coordinators for Minnesota District Courts, to establish procedures to monitor and report on the pilot project. On or before January 1, 2018, the Committee shall file a status report on the pilot project, with recommendations for any further rule amendments; and, recommendations for continuation, abandonment, or modification of the pilot project, or for permanent codification of the rules for the pilot project.

Dated: August 12, 2015                           BY THE COURT:

Lorie S. Gildea
Chief Justice

2

STATE OF MINNESOTA

IN SUPREME COURT

ADM09-8009

MEMORANDUM

PER CURIAM.

In December 2013 following a 2-year pilot project that allowed cameras and other recording equipment in courtrooms in certain civil proceedings, without requiring party consent, the court directed the Supreme Court Advisory Committee on the Rules of Criminal Procedure ("the Committee") to review a proposal by media representatives for a limited pilot project permitting audio and/or video coverage of certain criminal proceedings. *Promulgation of Amendments to the Minn. Gen. Rules of Prac.,* No. ADM09-8009, Order at 2-3 (Minn. filed Dec. 3, 2013). In July 2014 the Committee proposed amendments to the General Rules of Practice to authorize a pilot project permitting audio or video coverage, without party consent, of certain criminal trial court proceedings. Specifically, as recommended by the Committee, such coverage would be permitted in sentencing and other proceedings held after a guilty verdict has been returned or a guilty plea has been tendered.

After careful and thorough review of the Committee's recommendations, the written comments, and the public-hearing comments, the court authorizes a limited pilot project as follows:

- Except as limited below, electronic coverage shall be permitted at proceedings held in the courtroom in the presence of the presiding judge after a guilty verdict has been

returned or a guilty plea has been accepted, provided adequate advance notice of the intended coverage is given as directed by the trial court.

- Regardless of the consent of the parties:

    A. No electronic coverage is permitted of any proceeding held with a jury present.

    B. No coverage is permitted in any proceeding held in Minnesota's problem-solving courts, including drug courts, mental health courts, veterans court, and DWI courts.

    C. No coverage is permitted in cases involving crimes of criminal sexual conduct and/or family or domestic violence.

    D. No coverage of any testifying victim is permitted unless that victim, before testifying, affirmatively acknowledges and agrees in writing to the proposed coverage.

- In all other instances, the presiding judge may limit or exclude media requests for electronic courtroom coverage based on the interests and safety concerns of the participants to the proceedings, the decorum and dignity of the proceedings, and the impartial administration of justice.

We adopt the recommendation for a pilot project, with the additional limitations and restrictions set forth in the rules as amended, for the reasons explained below.

I.

Proceedings in Minnesota's courts are, generally, public. *See State v. Brown*, 815 N.W.2d 609, 616 (Minn. 2012); *Minneapolis Star & Tribune Co. v. Schumacher*, 392 N.W.2d 197, 202 (Minn. 1986) ("[W]hat transpires in the courtroom is public property." (quoting *Craig v. Harney*, 331 U.S. 367, 374 (1947) ("A trial is a public event."))); *see also* Minn. R. Pub. Access 2 ("Records of all courts . . . are presumed to be open to any member of the public for inspection"). We have therefore held that excluding the public from judicial proceedings is justifiable only when there are overriding interests. *See, e.g.,*

2

*State v. Fageroos*, 531 N.W.2d 199, 203 (Minn. 1995) (remanding for an evidentiary hearing on reasons for closing the courtroom during the testimony of minor victims); *State v. Schmit*, 273 Minn. 78, 88, 139 N.W.2d 800, 807 (1966) (holding that the exclusion of the public from a criminal trial violated the defendant's constitutional right to a public trial).

The individual member of the public, generally unable to attend trials for a host of reasons, depends on the information provided by those who do attend, including media representatives. *See Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 572-73 (1980) (plurality opinion) ("Instead of acquiring information about trials by firsthand observation or by word of mouth from those who attended, people now acquire it chiefly through the print and electronic media."). The media's right to be present at public court proceedings as a representative of the public is not at issue here. Rather, a narrow question is presented: whether electronic coverage by the media of public criminal proceedings in trial courts should be allowed without party consent.[1] Because we have faced this question before, we begin by reviewing the history of electronic coverage of Minnesota court proceedings.

The Minnesota Code of Judicial Conduct adopted in 1974 prohibited "broadcasting, televising, recording, or taking photographs in the courtroom . . . during sessions of court," Minn. Code Jud. Conduct 3A(7) (1978), unless the coverage did not

---

[1]     Cameras have long been allowed in Minnesota's appellate courts without party consent. *See* Minn. R. Civ. App. P. 134.10; *Amended Order Permitting Audio & Video Coverage of Appellate Court Proceedings*, No. C7-81-300 (Minn. filed Sept. 28, 1983).

distract the participants or impair the dignity of the proceedings; all parties and witnesses had consented; the "reproduction" was not exhibited until after all proceedings, including a direct appeal, were exhausted; and the reproduction was exhibited only for "instructional purposes in educational institutions." *Id.* In 1981, media representatives petitioned the court to amend Canon 3A(7) to allow coverage of trial court proceedings without regard to party consent. A court-appointed commission took testimony and in a report filed January 12, 1982, recommended that "video and audio coverage of trial court proceedings [be permitted] on an experimental basis for a reasonable period of time." *In re Modification of Canon 3A(7) of the Minn. Code of Jud. Conduct*, No. C7-81-300, Rep. of the Minn. Advis. Comm'n on Cameras in the Courtroom at 20 (Jan. 12, 1982).

The Commission majority concluded that Minnesota should "gain some experience on" media coverage in trial courts, rather than react to the experiences of other states. *Id.*, Mem. at 1. One member of the Commission dissented because the claimed benefits of courtroom coverage were unproven and were "far outweighed by the potential risk inherent in allowing" such coverage. *Id.*, Recommendations of Comm'r Kaner, Mem. at 7. Following a public hearing in June 1982, by a 7-2 decision, the court authorized a 2-year experimental program for audio and video coverage in the trial courts. *In re Modification of Canon 3A(7) of the Minn. Code of Jud. Conduct*, No. C7-81-300, Order at 2 (Minn. filed Apr. 18, 1983). Participation in the program was voluntary; that is, the Canon's consent requirement was retained. *Id.* at 3. Coverage was limited to proceedings in the courtroom, in the presence of the judge and jury. *Id.* No coverage of jurors or objecting witnesses was allowed, nor was coverage permitted in

family or juvenile proceedings or in cases involving police informants, relocated witnesses, sex crimes, trade secrets, or undercover agents. *Id.* at 3-4.[2]

The experimental program expired in 1987.[3] In October 1988, a media committee petitioned the court to reinstate the program, with the consent requirement removed. *In re Modification of Canon 3A(7) of the Minn. Code of Jud. Conduct*, 441 N.W.2d 452, 453 (Minn. 1989). The petitioners argued that "the initial consent requirements were so restrictive as to frustrate the intent of the experiment," and thus media was "consistently met with refusals by parties involved in litigation to allow coverage." *Id.* Following a public hearing, the court denied the petition but reinstated the experimental program authorized by the April 1983 order. *Id.* ("[T]he experimental program originally authorized by this Court by order of April 18, 1983 be, and the same is, reinstated . . ."). After balancing the public interest in camera coverage of trials against the "specific, identified interests and rights of participants" in those trials, the administration of justice, and its responsibility to "assure the continued availability of a public forum in which parties to civil or criminal proceedings may present their disputes for resolution . . . free

---

[2] Justice Yetka dissented, finding a lack of evidence "from any source . . . that cameras in the courtroom would enhance and improve the administration of justice." *Id.* at D-1 (Yetka, J., dissenting). He proposed that Minnesota "wait several years for further reaction" from other states that were experimenting with cameras in courtrooms. *Id.* at D-2. Justice Wahl also dissented, noting that the media sought access for "those very sensational criminal cases where it is most difficult for our judicial system to provide a fair trial." *Id.* at D-1 (Wahl, J., dissenting).

[3] In August 1985, the court extended the experimental program for an additional 2 years. *In re Modification of Canon 3A(7) of the Minn. Code of Jud. Conduct*, No. C7-81-300, Order (Minn. filed Aug. 21, 1985).

from active or subtle distractions or influences," the court maintained the consent requirement. *Id.* at 454.[4]

In January 1996, the court continued the experimental program until further order of the court. *In re Modification of Canon 3A(7) of the Minn. Code of Jud. Conduct*, No. C7-81-300, Order (Minn. filed Jan. 11, 1996).[5]

In March 2007 a Joint Media Committee petitioned the court to "reconsider and revise portions of its rules that, for decades, have effectively prevented audio and video coverage of trial court proceedings" by establishing a presumption in favor of coverage in most proceedings. *In re Proposed Amendments to Minn. Code of Jud. Conduct Canon 3A(11) & Minn. Gen. R. Prac. 4*, Petition of Minn. Joint Media Comm., et al., No. CX-89-1863 (Mar. 12, 2007). Petitioners argued that advances in technology and the expanding use of recording technologies in Minnesota courts (for some purposes) and in other states demonstrated that the court's concerns from the 1980s had largely been

---

[4] Justice Keith concurred, stating he was willing to allow audio and video coverage in trial court proceedings for a 1-year period because he considered the consent requirement responsible for the "limited use" of the experimental program. *Id.* at 455.

[5] By 1996, the Code of Judicial Conduct had been amended and renumbered, which "created confusion regarding the status of the experimental program." *In re Modification of Canon 3A(7) of the Minn. Code of Jud. Conduct*, No. C7-81-300, Order (Minn. filed Jan. 11, 1996). On December 18, 2008, the court abrogated the existing Code of Judicial Conduct, including the canon on electronic coverage of court proceedings, effective July 1, 2009. *Order Promulgating Revised Minn. Code of Jud. Conduct*, ADM08-8004, Order at 1 (Minn. filed Dec. 18, 2008). Thereafter, as recommended by the Supreme Court Advisory Committee on the General Rules of Practice, rules regarding electronic coverage of trial court proceedings were codified in the General Rules of Practice. Minn. Gen. R. Prac. 4; *see Recommendations of the Minn. Supreme Ct. Advis. Comm. on Gen. Rules of Prac.*, No. CX-89-1863, Final Rep. at 1 (Mar. 31, 2008).

"obviated" or could be accommodated without barring "nearly all electronic coverage." *Id.* at 5-6.

The court referred the petition to the Supreme Court Advisory Committee on the General Rules of Practice ("General Rules Committee"), which took public testimony and gathered its own research and information. Finding "insufficient evidence to support relaxation of the current rules," *Recommendations of the Minn. Supreme Ct. Advis. Comm. on Gen. Rules of Prac.*, No. CX-89-1863, Final Rep. at 6 (Mar. 31, 2008), a majority of the General Rules Committee recommended that the court retain the existing rule without substantial change. The General Rules Committee noted the continuing opposition to electronic coverage voiced by a majority of justice system participants; the absence of an identifiable benefit to the administration of justice; the potential chilling effect on the testimony of victims and witnesses; and the potential for increased costs borne by the judicial branch. *Id.* at 7-8.

Three members of the General Rules Committee, noting that the courts "do the public's business," concluded that a more relaxed rule should be adopted unless it could be shown that doing so "will degrade or detract from the quality of administration of justice in Minnesota's trial courts." *Id.* at 20-21. The minority proposed a continuation of the experimental program, with modified rules to allow individual judges to exercise their discretion to prohibit electronic coverage. *Id.* at 24.

Following a public comment period and a public hearing, the court directed the General Rules Committee to develop and propose a pilot project to study the impact of electronic coverage on victims and witnesses, which in turn would "provide the court

7

with additional information important to any final decision it might make regarding the presence or absence of cameras in the courtroom." *Promulgation of Amendments to the Minn. Gen. Rules of Prac.*, No. CX-89-1863, Mem. at 1 (Minn. filed Feb. 12, 2009).[6] Pending the General Rules Committee's recommendation, the existing requirement for consent of all parties to electronic coverage of trial court proceedings was retained.

In March 2011, having considered the recommendations of the General Rules Committee for possible research studies, the court concluded that "it is time for Minnesota to move forward with a pilot project allowing cameras in courtrooms in certain civil proceedings." *Promulgation of Amendments to the Minn. Gen. Rules of Prac.*, No. ADM09-8009, Mem. at 8 (Minn. filed Mar. 11, 2011).[7] Thus, a 2-year pilot project permitting cameras in courtrooms in certain *civil* proceedings with the consent of just the district court judge was approved. *Id.*, Order at 1-2. Criminal cases and civil cases involving child custody, dissolution, juvenile proceedings, child protection proceedings, paternity, civil commitment, orders for protection, and trade secrets were excluded from the pilot. *See id.*, Order at 2; *see also* Minn. Gen. R. Prac. 4.02(c)(vi).

---

[6]  Justice Dietzen concurred, noting concerns about the impact on a defendant's right to a fair trial, the possibility that the pilot project may not provide reliable results, and the potential financial impact on the judiciary. *Id.* at C-1 (Dietzen, J., concurring).

Justice Page dissented, concluding that in the face of uniform objections raised by justice system participants, "changing our rules to allow the expanded use of cameras in our trial court courtrooms will [not] 'contribute materially' to ensuring a fair trial" but "may have the opposite effect." *Id.* at D-10 (Page, J., dissenting). Justice Page also noted that expanded electronic coverage "will do nothing to assist in the elimination of racial bias from our judicial system and will, in fact, exacerbate the problem." *Id.* at D-7.

[7]  The recommended research studies were not adopted due in part to the Judicial Branch's financial constraints. *Id.* at 7-8.

The existing limitations on media coverage of trial court proceedings, which exclude coverage of jurors and objecting witnesses and limit coverage to proceedings in the courtroom and in the presence of the presiding judge, were continued in the pilot. *Promulgation of Amendments to the Minn. Gen. Rules of Prac.*, No. ADM09-8009, Order at 2 (Minn. filed Mar. 11, 2011).

On October 1, 2013, the Advisory Committee on the General Rules of Practice reported on the status of the pilot project. *Recommendations of Minn. Supreme Ct. Advis. Comm. on Gen. Rules of Prac.*, No. CX-89-1863, Final Rep. (Oct. 1, 2013). Although noting the "paucity of requests" for electronic coverage in civil trials in the preceding 2 years, the Committee recommended that the court consider either extending the pilot project or codifying the rules for the project. *Id.* at 3, 6. The Committee also recommended that the court consider expanding the pilot to some criminal proceedings. *Id.* at 6-7. The Committee offered no opinion on how the pilot could be implemented in criminal proceedings, but proposed instead that a "thorough examination of the criminal justice process" be undertaken to "assess the wisdom of this extension and the appropriate limits" to electronic coverage. *Id.* at 7.

On December 3, 2013, the court codified the pilot rules as the "final procedures for requesting, permitting, and using cameras and other recording equipment in certain civil-court proceedings." *Promulgation of Amendments to the Minn. Gen. Rules of Prac.*, No. ADM09-8009, Order at 2 (Minn. filed Dec. 3, 2013). The court also directed the Supreme Court Advisory Committee on Rules of Criminal Procedure to review the proposal by certain news media petitioners to expand the civil pilot project "to certain

9

criminal proceedings where concerns previously expressed regarding witnesses and jurors are minimized or largely absent, such as arraignments, pretrial hearings, and sentencing proceedings." *Id.*

In response to the December 3, 2013, Order, the Committee filed a report on July 29, 2014. *Report and Proposed Amendments to the Minn. Gen. Rules of Prac.*, No. ADM10-8049 (filed July 29, 2014). A majority of the Committee—11 of 15 members voting—recommended that Rule 4 of the General Rules of Practice be amended to permit electronic coverage in criminal cases of sentencing and other proceedings held after a guilty verdict has been returned or a guilty plea has been tendered, regardless of the consent of the parties.[8]

In summary, Minnesota has allowed electronic coverage of public criminal proceedings since at least 1983. Practically speaking, however, the requirement for party consent has operated to prevent that coverage.[9]

## II.

Proceedings in Minnesota's courts are public. *See Minneapolis Star & Tribune Co. v. Kammeyer*, 341 N.W.2d 550, 559 (Minn. 1983); *State v. Schmit*, 273 Minn. 78, 80, 139 N.W.2d 800, 802-03 (1966). While the public status of court proceedings is not "absolute in the sense that everyone who wishes to attend may do so," *Schmit*, 273 Minn.

---

[8]    Four committee members voted against the recommendation for a pilot project, though one of those members supported the recommended pilot if any pilot was to be approved.

[9]    *See also Chandler v. Florida*, 449 U.S. 560, 564 (1981) ("The[] initial guidelines [for electronic coverage in Florida courts] required the consent of all parties. It developed, however, that in practice such consent could not be obtained.").

10

at 81, 139 N.W.2d at 803, we have said that the "general public is free to attend" a criminal proceeding, and therefore the "doors of the courtroom are expected to be kept open." *Id.* at 83, 139 N.W.2d at 804-05. The United States Supreme Court has said the public nature of criminal proceedings is "one of the essential qualities of a court of justice." *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 567 (1980) (citation omitted). The constitutional right to a public trial, *see* Minn. Const. art. I, § 6, ensures that an accused is "dealt with justly, protected . . . against gross abuses of judicial power [and] petty arbitrariness" in a proceeding that "hopefully promotes confidence in the fair administration of justice." *Schmit,* 273 Minn. at 86-87, 139 N.W.2d at 806-07. Public scrutiny of judicial proceedings also provides "a form of legal education." *State v. Brown*, 815 N.W.2d 609, 617 (Minn. 2012) (citation omitted).

Thus, there "can be no blinking the fact that there is a strong societal interest in public trials." *Gannett Co. v. DePasquale*, 443 U.S. 368, 383 (1979). While the constitutional right to a public trial is a personal right of the defendant, *Kammeyer*, 341 N.W.2d at 554, the right of the public and the media to attend trials is "implicit in the guarantees of the First Amendment." *Richmond Newspapers, Inc.*, 448 U.S. at 580; *see also id.* at 584 ("[T]he First Amendment protects the public and the press from abridgment of their rights of access to information about the operation of their government, including the Judicial Branch . . .") (Stevens, J., concurring). To be sure, the fundamental right of a defendant to a fair trial takes precedence over the media's right to cover a public trial. *See Press-Enter. Co. v. Super. Ct. of Calif., Riverside Cty.*, 464 U.S. 501, 508 (1984) ("No right ranks higher than the right of the accused to a fair trial.").

11

But together, these constitutional public-trial rights promote compelling interests in the fair, open, and impartial administration of justice. "The value of openness lies in the fact that people not actually attending trials can have confidence that standards of fairness are being observed; . . . [o]penness thus enhances both the basic fairness of the criminal trial and the appearance of fairness so essential to public confidence in the system." *Id.* at 508; *see also In re Post-Newsweek Stations, Fla., Inc.,* 370 So. 2d 764, 780 (Fla. 1979) ("It is essential that the populace have confidence in the [judicial] process, for public acceptance of judicial judgments and decisions is manifestly necessary to their observance." (citation omitted)).

For 30 years, we have debated the consent requirement for electronic media coverage of courtroom proceedings. The content of the debate has not changed, nor have the voices in the debate. There is no question that Minnesota's consent requirement operates to effectively bar electronic coverage of public criminal courtroom proceedings. The only question is whether we should continue to allow the parties, through a consent requirement, to effectively control the nature of media coverage in the courtroom.

The objections to electronic media coverage of courtroom criminal proceedings raise credible concerns. Certainly there are instances in which electronic media coverage of courtroom proceedings has prejudiced a defendant's right to a fair trial. *See Sheppard v. Maxwell,* 384 U.S. 333, 355, (1966) ("Bedlam reigned at the courthouse during the trial and newsmen took over practically the entire courtroom, hounding most of the [trial] participants . . ."); *Estes v. Texas,* 381 U.S. 532, 538 (1965) ("[T]here had been a bombardment of the community with the sights and sounds [of the hearing] during which

12

the [trial participants] were highly publicized."). But irresponsible media coverage is not limited to its electronic form, nor does withholding party consent to electronic coverage of courtroom proceedings prevent prejudicial media coverage. *See, e.g., State v. Blom*, 682 N.W.2d 578, 607-611 (Minn. 2004) (noting that "[t]he court indicated that it shared [the defendant's] concern that he be given a fair trial by impartial jurors" in light of pretrial publicity, and described steps taken to control courtroom procedures during trial to protect against "prejudicial publicity"); *Thompson v. State*, 289 Minn. 270, 273, 183 N.W.2d 771, 773 (1971) ("[T]he news media's lack of restraint preceding the trial left much to be desired . . .").[10]

On the other hand, some commentary suggests that responsible electronic coverage and the fair administration of justice can co-exist in the courtroom. *See* Alex Kozinski & Robert Johnson, *Of Cameras and Courtrooms*, 20 Fordham Intell. Prop. Media & Ent. L.J. 1107, 1114-15 (2010) (reviewing "empirical evidence from the states" and noting that "[a]necdotally, witnesses, judges, jurors and attorneys report that once a trial gets under way they tend to forget the cameras are there"); Ralph E. Roberts, Jr., Comment, *An Empirical and Normative Analysis of the Impact of Televised Courtroom*

---

[10] New York "forbid[s]" electronic coverage of state court proceedings, N.Y. Comp. Codes R. & Regs., tit. 22, § 29.1, and electronic coverage of courtroom proceedings is generally not permitted in federal courts. However, an attorney representing a defendant in federal criminal proceedings in New York courts described written media coverage of pretrial and trial proceedings as "often marred by false or prejudicial information," stating it is "difficult to imagine anything more prejudicial than claiming a defendant has been charged with multiple murders when in fact the indictment clearly recites only one count of RICO conspiracy." John C. Meringolo, *The Media, the Jury, and the High-Profile Defendant: A Defense Perspective on the Media Circus*, 55 N.Y.L. Sch. Rev. 981, 1006 (2010).

*Proceedings*, 51 SMU L. Rev. 621, 631 (1998) ("The [study of a pilot allowing cameras in certain federal civil cases] found that the district judges who had some type of experience with cameras in the courtroom believed that the cameras had a minor effect on the trial" and were "nearly unanimous that the presence of cameras did not create a lack of courtroom decorum nor . . . have a negative effect on the attorneys."). We are reluctant, however, to take comfort in "anecdotal" reports from other states, which illustrates the problem: our ability to assess the merits of commenters' concerns and the effectiveness of measures that address those concerns is hampered by the absence of actual experiences and outcomes in Minnesota courtroom proceedings. *See* Roberts, *supra,* at 621 ("[T]here has been very little empirical analysis by the legal community to determine the real effects of televised court proceedings."); Jeffrey S. Johnson, Comment, *The Entertainment Value of a Trial: How Media Access to the Courtroom is Changing the American Judicial Process*, 10 Vill. Sports & Ent. L.J. 131, 149 (2003) ("Although there is some concrete evidence on the effect of television cameras on certain parties, much of the commentary is mere speculation based on hypothetical situations.").

Thus, although we share the concerns about the potential for intrusive, disrespectful, or even prejudicial electronic coverage of criminal proceedings, we cannot see that a party-consent requirement is the only means to protect against those risks. Rather, we conclude that a better balancing of the compelling interests in the fair, open, and impartial administration of justice can be achieved when electronic coverage of courtroom proceedings is permitted under the conditions we set out today and subject to the control of the presiding judge. In reaching this conclusion, we do not ignore the

14

examples of irresponsible media coverage that underlie the commenters' concerns. *See, e.g.*, Nancy S. Marder, *The Conundrum of Cameras in the Courtroom*, 44 Ariz. St. L.J. 1489, 1550 (2012) (reviewing state criminal trials "that serve as warnings" about "what can go wrong when there are cameras in the courtroom."). But the potential for prejudicial media coverage is not eliminated simply because electronic coverage is excluded from the courtroom, or because we vest control over the decision to allow that coverage in the hands of the parties. Nor do we foster public confidence in the sound and fair administration of justice by limiting electronic coverage of criminal proceedings to the images captured and the statements delivered outside the courtroom by representatives of the media, the prosecution, and the defense.

We conclude that there is good reason to lift the blanket exclusion of electronic coverage of public criminal proceedings so that we can study the impact of electronic coverage of those proceedings. Thus, with the amendments promulgated today, we lift the consent requirement in limited circumstances.

## III.

The dissent criticizes the court for permitting a pilot project without first "requiring that the asserted benefits [of camera coverage] be established with evidence." Based on the potential adverse consequences that could flow from expanded electronic courtroom coverage of certain criminal proceedings, the dissent concludes the pilot project can only facilitate irresponsible and prejudicial media coverage. With respect to the dissent, we disagree.

15

First, in demanding that the benefits of courtroom coverage initially be established with compelling evidence, the dissent ignores the purpose of the pilot project: to gather data that will assist us in fairly evaluating the asserted benefits and potential consequences of electronic courtroom coverage in certain Minnesota criminal proceedings. The need for data from Minnesota proceedings was acknowledged in 1982, *see In re Modification of Canon 3A(7) of the Minn. Code of Jud. Conduct*, Rep. of the Minn. Advis. Comm'n on Cameras in the Courtroom, Mem. at 1 (Jan. 12, 1982) ("[I]t might be remiss not to gain some experience on this subject in the trial courts of this state . . ."), and the debate over electronic courtroom coverage in the intervening years continues to press the same opposing positions.[11] These competing positions convince us that we need concrete evidence drawn from Minnesota proceedings to evaluate the strength of those positions. We cannot simply choose one side and require the proponents of the other position to "prove" their case. In addition, we made the policy decision, 25 years ago, to permit cameras in Minnesota's courtrooms, albeit subject to

---

[11]    For example, while the dissent contends the benefits of electronic courtroom coverage are easily refuted, the experiences of other jurisdictions show that the "adverse impacts [of camera coverage] on witnesses and jurors are not universal." *Report of the Comm. to Study Extended Media Coverage of Criminal Trial Proceedings in Maryland*, at viii (2008), *available at* http://www.courts.state.md.us/publications/pdfs/mediacoveragereport08.pdf. *See also* Marjorie Cohn & David Dow, Cameras in the Courtroom 63 (1998) ("[A]ll the studies arrived at the same conclusion: that camera coverage did not affect [courtroom] proceedings negatively."); Cathy Packer, *Should Courtroom Observers Be Allowed to Use Their Smartphones and Computers in Court? An Examination of the Arguments*, 36 Am. J. Trial Advoc. 573, 592 (2013) ("The results from state studies were unanimous: electronic media coverage of courtroom proceedings—whether civil or criminal—has no detrimental impact on the parties, jurors, counsel, or courtroom decorum.").

party consent. Our decision today does not reverse that policy decision; it modifies it. We authorize a pilot project designed to do just as the dissent suggests: gather the concrete data to evaluate the pros and cons of electronic courtroom coverage, but without the party consent requirement that has thwarted the collection of such data.

Second, our decision to use a pilot project to gather data—rather than pre-judge the question—is consistent with our past, cautious approach to electronic coverage of public judicial proceedings, as well as the approach taken by other jurisdictions. We began with a pilot project in 1983, reinstated the pilot in 1989, and approved a different pilot project, for civil cases, in 2011. The federal judiciary has used a similar approach.[12] Other states have also used pilot projects to evaluate a change in their policies for electronic courtroom coverage.[13] The data-gathering tool of a pilot project is a well-established approach for evaluating different methods of implementing our decision to permit limited electronic courtroom coverage. *See, e.g., Chandler v. Florida*, 449 U.S. 560, 582 (1981) ("[U]nless we were to conclude that television coverage under all conditions is prohibited by the Constitution, the states must be free to experiment.").

---

[12] Although it declined to continue electronic courtroom coverage when its study period ended in 1994, by 2010 the Federal Judicial Conference had "authorized a pilot project to evaluate the effect of cameras in district court courtrooms, of video recordings of proceedings therein, and of publication of such video recordings." *Report of the Proceedings of the Judicial Conference of the United States* at 11 (Sept. 14, 2010) *available at* http://www.uscourts.gov/about-federal-courts/reports-proceedings-judicial-conference.

[13] *See In re Extended Media Coverage in the Circuit Courts of Illinois on an Experimental Basis*, M.R. 2634 (Ill. Jan. 24, 2012) *available at* http://www.illnoiscourts.gov/supremecourt/announce/2012/012412; *In re Pilot Project for Electronic News Coverage in Indiana Trial Courts*, 895 N.E.2d 1161 (Ind. 2006).

17

Third, in assuming that the only result of electronic courtroom coverage is unbalanced, prejudicial, and irresponsible journalism, the dissent fails to appreciate the guidelines that will govern this pilot. The exclusions from coverage far exceed the limited opportunities for post-guilty plea or verdict coverage: no coverage with a jury present, no coverage in any problem-solving court, no coverage in cases involving charges of criminal sexual conduct or family or domestic violence, and no coverage of any testifying victim who does not affirmatively consent, in writing, to that coverage. Further, all coverage is subject to the presiding judge's authority to limit or exclude coverage based on case-specific concerns and the impartial administration of justice. The pilot will allow us to determine whether these prudent measures will lead to balanced coverage while protecting the interests of all participants, including the defendant.

While we disagree with the dissent's conclusions, we respect Justice Page's observation that in reporting on criminal matters, disproportionate media coverage of communities of color, particularly African American community members, has negative repercussions. We will be alert to any such concerns during the pilot and will monitor the pilot coverage.

We remind all who attend courtroom proceedings that the right of access to public courtrooms "is not absolute" and that the trial court judge "must have control of its courtroom." *Kammeyer*, 341 N.W.2d at 559. Trial court judges have a "grave responsibility" and "broad discretion" to "oversee[] and regulat[e] courtroom conduct and procedures during . . . criminal trials." *State v. Lindsey*, 632 N.W.2d 652, 658 (Minn. 2001). It bears repeating that the concerns of victims and other justice system

18

participants are serious. No less important are the concerns of a defendant who, even after a guilty verdict has been returned or a guilty plea accepted, expects and deserves the fair administration of justice. *See Press-Enter. Co.*, 464 U.S. at 508 ("No right ranks higher than the right of the accused to a fair trial."); *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 560 (1976) ("It is not asking too much to suggest that those who exercise First Amendment rights in newspapers or broadcasting enterprises direct some effort to protect the rights of an accused to a fair trial by unbiased jurors."). Thus, while we are mindful that the *content* of the coverage falls within the media's realm, *see, e.g., Richmond Newspapers, Inc.*, 448 U.S. at 576-77, we firmly embrace the judicial branch's responsibility to control the time, place, and manner of the media's access. *Id.* at 578 ("Subject to the traditional time, place, and manner restrictions . . . a trial courtroom is . . . a public place where the people generally—and representatives of the media—have a right to be present"); *see also* Stacy Blasiola, *Say Cheese! Cameras and Bloggers in Wisconsin's Courtrooms*, 1 Reynolds Cts. & Media L.J. 197, 206 (2011) ("[H]aving access to a courtroom with a camera or recording device does not necessarily mean a reporter has an absolute right to stay.").[14]

---

[14] The Minnesota District Judges Association submitted written comments in opposition to the Committee's recommended rule amendments. In our experience, district court judges carefully exercise their responsibility to control the courtroom. We are confident that they will be able to do so under this limited pilot project, particularly with the assistance of the media coordinators who have experience with electronic coverage in civil cases.

## IV.

We repeat a comment first made in 1982: it is time for Minnesota to gain some experience with electronic coverage of public courtroom criminal proceedings in the context of proceedings in Minnesota courts, with participants subject to the strict guidelines of a pilot and the rules of Minnesota courts. *In re Modification of Canon 3A(7) of the Minn. Code of Jud. Conduct*, Rep. of the Minn. Advis. Comm. on Cameras in the Courtroom, Mem. at 1 (Jan. 12, 1982). The pilot project authorized now is limited to proceedings that do not include a jury and that occur after a guilty verdict has been returned or a guilty plea accepted.[15] In addition, given the fundamental right of a defendant to the fair administration of justice, and the profound privacy and safety interests of trial participants, we conclude that further limits on the scope of permitted coverage are necessary.[16]

First, no coverage is permitted of proceedings held with a jury present, held after a guilty verdict is vacated or reversed and a new trial is ordered, or held after a guilty plea is rejected or withdrawn.

---

[15] The Committee recommended that electronic coverage be permitted after a guilty plea has been "tendered." Consistent with Minn. R. Crim. P. 15, we use the designation "accepted" to establish the point in the proceedings after which electronic coverage is allowed.

[16] In authorizing a pilot project that does not require party consent in certain criminal proceedings, we note that postconviction proceedings, although technically civil, are brought "in the district court in the county in which the conviction was had," Minn. Stat. § 590.01, subd. 1 (2014), and are within the scope of the pilot. On the other hand, notwithstanding the public status of some juvenile delinquency proceedings, *see* Minn. Stat. § 260B.163, subd. 1(c) (2014), *all* juvenile proceedings are excluded from the permitted scope of electronic coverage. *See* Minn. Gen. R. Prac. 4.02(c)(vi).

20

Second, no coverage is permitted in any of Minnesota's problem-solving courts, including drug courts, mental health courts, veterans courts, and DWI courts, or of any juvenile proceedings.

Third, no coverage is permitted in cases involving charges of criminal sexual conduct brought under Minn. Stat. §§ 609.293-.352 (2014), or in cases involving charges of family or "domestic violence," as defined in Minn. Stat. § 609.02, subd. 16 (2014).

Fourth, no coverage is permitted of any victim who testifies at a post-verdict or post-plea proceeding unless that victim affirmatively acknowledges and agrees to the coverage in writing, before testifying.

Fifth, we remind all criminal justice system participants, and particularly the media, that the pilot project authorized here is subject at all times to the authority and broad discretion of the trial judge to control the decorum of the proceedings and ensure the fair administration of justice is preserved.[17]

Finally, we remind all participants that we authorize a pilot project only. Therefore, the Advisory Committee on the Rules of Criminal Procedure is directed to work with the State Court Administrator or his designee, and the statewide media coordinators for Minnesota District Courts, to establish procedures to monitor and report

---

[17] The pilot project is also subject to existing requirements and limits in the rules for timely pre-coverage notice to the trial court, and as directed by the court, to the attorneys and witnesses; existing limits on the type and number of equipment and equipment operators; and requirements for pooling. *See* Minn. Gen. R. Prac. 4.04. We also acknowledge the invaluable assistance provided thus far by the statewide media coordinators in facilitating media coverage in certain civil matters. We therefore direct the media and trial courts to continue to work with those representatives for purposes of the pilot project in criminal proceedings.

on the pilot project. The monitoring should, to the extent feasible, collect data on requests for coverage; the conditions under which coverage is permitted; the reasons for excluding coverage when requests are denied; and to the extent available from attorneys, victims, and other courtroom participants, information on the impact if any or reaction to the permitted coverage. On or before January 1, 2018, the Committee shall file a status report on the pilot project, with recommendations for continuation, abandonment, or modification of the pilot project, the reasons for the recommendations, and any proposed amendments to the rules governing the pilot project.

[Note: Deletions are indicated by a line drawn through the text; additions are underlined.]

## RULE 4.  PICTURES AND VOICE RECORDINGS

\*   \*   \*

**Rule 4.02  Exceptions**

(a)    A judge may authorize the use of electronic or photographic means for the presentation of evidence, for the perpetuation of a record or for other purposes of judicial administration.

(b)    A judge may authorize the broadcasting, televising, recording or photographing of investitive, ceremonial or naturalization proceedings.

(c)    A judge may authorize, with the consent of all parties in writing or made on the record prior to the commencement of the trial in criminal proceedings, and without the consent of all parties in civil proceedings, the photographic or electronic recording and reproduction of appropriate court proceedings under the following conditions:

(i)    There shall be no audio or video coverage of jurors at any time during the trial, including *voir dire*.

(ii)    There shall be no audio or video coverage of any witness who objects thereto in writing or on the record before testifying.

(iii)    Audio or video coverage of judicial proceedings shall be limited to proceedings conducted within the courtroom, and shall not extend to

activities or events substantially related to judicial proceedings that occur in other areas of the court building.

(iv)     There shall be no audio or video coverage within the courtroom during recesses or at any other time the trial judge is not present and presiding.

(v)     During or preceding a jury trial, there shall be no audio or video coverage of hearings that take place outside the presence of the jury. Without limiting the generality of the foregoing sentence, such hearings in criminal proceedings would include those to determine the admissibility of evidence, and those to determine various motions, such as motions to suppress evidence, for judgment of acquittal, *in limine* and to dismiss. This provision does not prohibit audio or video coverage of appropriate pretrial hearings in civil proceedings, such as hearings on dispositive motions.

(vi)     There shall be no audio or video coverage in cases involving child custody, marriage dissolution, juvenile proceedings, child protection proceedings, paternity proceedings, civil commitment proceedings, petitions for orders for protection, motions to suppress evidence, police informants, relocated witnesses, sex crimes, trade secrets, undercover agents, and proceedings that are not accessible to the public.

(d)     **Criminal proceedings: pilot project.** Notwithstanding the lack of consent by the parties, for purposes of the pilot project authorized by order of the supreme court, upon receipt of notice from the media pursuant to Rule 4.03(a), a judge must, absent good

2

cause, allow audio or video coverage of a criminal proceeding occurring after a guilty plea has been accepted or a guilty verdict has been returned. To determine whether there is good cause to prohibit coverage of the proceeding, or any part of it, the judge must consider (1) the privacy, safety, and well-being of the participants or other interested persons; (2) the likelihood that coverage will detract from the dignity of the proceeding; (3) the physical facilities of the court; and, (4) the fair administration of justice. Coverage under this paragraph is subject to the following limitations:

(i) No audio or video coverage is permitted when a jury is present, including for hearings to determine whether there are aggravating factors that would support an upward departure under the sentencing guidelines, or new pretrial and trial proceedings after a reversal on appeal or an order for a new trial.

(ii) No coverage is permitted at any proceeding held in a problem-solving court, including drug courts, mental health courts, veterans courts, and DWI courts.

(iii) No coverage is permitted in cases involving charges of criminal sexual conduct brought pursuant to Minn. Stat. §§ 609.293-.352, or in cases involving charges of family or "domestic" violence as defined in Minnesota Statutes section 609.02, subdivision 16.

(iv) No audio or video coverage is permitted of a testifying victim, as defined in Minn. Stat. § 611A.01(b), unless that person affirmatively acknowledges and agrees in writing before testifying to the proposed coverage.

(v) Audio or video coverage must be limited to proceedings conducted within the courtroom, and shall not extend to activities or events substantially related to judicial proceedings that occur in other areas of the court building.

(vi) No audio or video coverage within the courtroom is permitted during recesses or at any other time the trial judge is not present and presiding.

## Rule 4.03. Procedures Relating to Requests for Audio or Video Coverage of Authorized District Court Civil-Proceedings

The following procedures apply to audio and video coverage of civil district court proceedings where authorized under Rule 4.02(c), or in criminal proceedings subject to the pilot project authorized by supreme court order and Rule 4.02(d):

(a) **Notice**. Unless notice is waived by the trial judge, the media shall provide written notice of their intent to cover authorized district court civil-proceedings by either audio or video means to the trial judge, all counsel of record, and any parties appearing without counsel as far in advance as practicable, and at least 10 days before the commencement of the hearing or trial. A copy of the written notice shall also be provided to the State Court Administrator's Court Information Office. The media shall also notify their respective media coordinator, identified as provided under part (e) of this rule, of the request to cover proceedings in advance of submitting the request to the trial judge, if possible, or as soon thereafter as possible.

(b) **Objections**. If a party opposes audio or video coverage, the party shall provide written notice of the party's objections to the presiding judge, the other parties,

4

and the media requesting coverage as soon as practicable, and at least 3 days before the commencement of the hearing or trial in cases where the media have given at least 10 days' notice of their intent to cover the proceedings. The judge shall rule on any objections and make a decision on audio or video coverage before the commencement of the hearing or trial. However, the judge has the discretion to limit, terminate, or temporarily suspend audio or video coverage of an entire case or portions of a case at any time.

(c) **Witness Information and Objection to Coverage.** At or before the commencement of the hearing or trial in cases with audio or video coverage, each party shall inform all witnesses the party plans to call that their testimony will be subject to audio or video recording unless the witness objects in writing or on the record before testifying.

(d) **Appeals.** No ruling of the trial judge relating to the implementation or management of audio or video coverage under this rule shall be appealable until the underlying matter becomes appealable~~trial has been completed~~, and then only by a party.

(e) **Media Coordinators.** Media coordinators for various areas of the state shall be identified on the main state court web site. The media coordinators shall facilitate interaction between the courts and the electronic media regarding audio or video coverage of authorized district court ~~civil~~ proceedings. Responsibilities of the media coordinators include:

(i) Compiling basic information (e.g., case identifiers, judge, parties, attorneys, dates and coverage duration) on all requests for use of audio and video

5

coverage of authorized ~~civil~~ trial court proceedings for their respective court location(s) as identified on the main state court web site, and making aggregate forms of the information publicly available;

(ii) Notifying the Minnesota Court Information Office of all requests for audio and video coverage of ~~civil~~ trial court proceedings for their respective court location(s) as identified on the main state court web site;

(iii) Explaining to persons requesting video or audio coverage of ~~civil~~ trial court proceedings for their respective court location(s) the local practices, procedures, and logistical details of the court related to audio and video coverage;

(iv) Resolving all issues related to pooling of cameras and microphones related to video or audio coverage of ~~civil~~ trial court proceedings for their respective court location(s).

# DISSENT

PAGE, Justice (dissenting).

I respectfully dissent. The court's decision, which authorizes a pilot program that would allow, without the parties' consent, audio and video coverage of certain criminal trial court proceedings, is fundamentally wrong and poor public policy. What research there is on how cameras in the courtroom affect criminal proceedings suggests that there is little, if any, benefit to the public. At the same time, we know that the potential for harm to participants in the criminal justice system is real.

In 2009, I outlined two primary concerns in opposing the development of a pilot program that expanded camera use in our district court courtrooms. First, prosecutors, public defenders, private attorneys, advocates for victims, and our racial fairness committee all expressed concern that changing our rules to allow the expanded use of cameras in our state's courtrooms would not "contribute materially" to ensuring that a defendant receives a fair trial. *See Promulgation of Amendments to the Minn. Gen. Rules of Prac.*, No. CX-89-1863, Mem. at 2 (Minn. filed Feb. 12, 2009) (Page, J., dissenting). In fact, these groups suggested that expanded camera access could negatively impact a defendant's fair trial right. *Id.* Second, given the media's documented treatment of African Americans and other people of color accused of crime, I concluded that expanding the use of cameras would erode the court's ability to prevent "unjustified and mistaken deprivations." *Id.* at 6-10. Notwithstanding these concerns, the court concluded that "it is time for Minnesota to move forward with a pilot project allowing cameras in the courtrooms in certain civil proceedings." *See Promulgation of*

*Amendments to the Minn. Gen. Rules of Prac.*, No. CX-89-1863, Mem. at 8 (Minn. filed Feb. 12, 2009). The camel's nose was officially in the tent. Since 2009, research has heightened the concern that expanding the use of cameras in our courtrooms provides little benefit while creating a great deal of potential harm. Yet the court has no qualms about escorting the remainder of the camel into the tent.

## I.

Proponents of expanded usage of cameras in courtrooms frame the debate in terms of a cost-benefit analysis. They contend that the primary cost—interference with the Sixth Amendment guarantee of a fair trial—has not been proven with empirical evidence. They then assert that the primary benefit—the achievement of public education and public confidence in the judiciary—is an unrefuted certainty. In adopting the proponents' view without requiring that the asserted benefits be established with evidence, the court justifies the potential for harm by asserting that irresponsible media coverage and prejudice will persist with or without expanded camera access to criminal proceedings. That the media might be irresponsible is no reason for the judiciary to facilitate them. By failing to assess the validity of the proponents' arguments, the court, relying on unsupported assumptions, will be complicit in any prejudice to the administration of justice that results from irresponsible use of cameras in our courtrooms.

According to the proponents, video coverage of trial proceedings is the only way to reach the larger populace and educate them about the judicial system. Such a contention is easily refuted, however, because television news coverage with live footage does not significantly increase viewer retention of content relative to print, audio, or

footage-free television coverage. *See* Cristina Carmody Tilley, *I Am A Camera: Scrutinizing the Assumption That Cameras in the Courtroom Furnish Public Value by Operating As A Proxy for the Public*, 16 U. Pa. J. Const. L. 697, 697-98 (2014). This is true for two primary reasons. First, studies suggest that the gap between television's educational potential and its actual inferiority to print results from limits on the human ability to process divergent informational cues. *Id.* at 729. Second, research also suggests that the media tends to focus its coverage more on entertainment than education. Nathan Braverman et al., *Report of the Committee to Study Extended Media Coverage of Criminal Trial Proceedings in Maryland* (2008). This reality casts doubt on the potential educational benefits that video coverage of trial proceedings might provide.

Beginning with the cognitive limitations associated with television's educational potential, one theory is that when an individual is required to process inconsistent verbal and visual cues, that individual will exceed his or her processing capacity and will default to the verbal cue. *See* Tilley, *supra*, at 729. This often occurs in the media as the images chosen frequently reflect "the person and place concrete details of news stories," rather than the issue being presented. *Id.* As one television pioneer remarked, "comings and goings make easy pictures; the issues usually do not." *Id.* With these inconsistent signals, viewers lack the capacity to retain key information and educate themselves. Research supports this theory. For example, one study of 68 undergraduate students found that viewer retention from print sources was significantly higher than viewer retention from audio sources, and that viewer retention from audio sources was significantly higher than viewer retention from television sources. A. Furham, & B.

Gunter, *Sex, Presentation Mode, and Memory for Violent and Non-violent News*, Journal of Education Television, 99, 100-01 (1985). Similarly, one study has found that participants who watched television news did not have significantly higher comprehension scores than those who did not watch television news, while participants who read newspapers had significantly higher comprehension scores than those who did not read newspapers. John P. Robinson & Dennis K. Davis, *Television News and the Informed Public: An Information-Processing Approach*, J. Commc'n 106, 112-14 (1990).

In 2007, the Maryland Judicial Conference established a committee (the Committee) to assess whether video coverage was appropriate for criminal trials in Maryland. *See* Braverman et al., *supra*, at 22. The Committee found that the public education benefits of extended media coverage were "more aspirational than real":

> In actuality, audio-visual coverage of trial proceedings restricts, rather than enhances the flow of information about the legal process. It typically consists of little more than sound bites and snippets, lacking in context and content, intended more to entertain than to inform. This results in a dangerous potential to distort what actually happens inside the courtroom.

*Id.*

The Committee also examined a 1994 study on a pilot program of cameras in federal courts conducted by the Federal Judicial Center (FJC). *Id.* at 14. The Committee highlighted the FJC study's findings that

> broadcast stories about proceedings covered by electronic media used an average of 56 seconds of courtroom footage per story, but that reporters narrated over 63% of that footage. This left only 21 seconds of actual courtroom audio for use in a typical news story. . . .

With respect to the nature of information conveyed, the study found that plaintiffs and their attorneys were given more air time than defendants and their counsel; 95% of first day stories neglected to mention that the proceeding was civil rather than criminal; almost three-quarters failed to mention whether a jury was present; and more than two-thirds neglected to mention the next step in the litigation process.

*Id.* at 24-25. Based on these and other factors, the FJC concluded:

[T]he stories did not provide a high level of detail about the legal process in the cases covered. In addition, the analysis revealed that increasing the proportion of courtroom footage used in a story did not significantly increase the information given about the legal process.

*Id.* at 25.

Moreover, the Committee also highlighted the results of a 2002 comparative analysis of the contents of 279 newspapers articles and 719 television newscasts from five media markets:

[T]here is unmistakable, if somewhat subtle, evidence that news organizations do prefer to report on what will interest us, regardless of its importance or implications for us, and they are partial to stories and sources that are most accessible and therefore easiest to cover. The most frequent subjects of coverage are violence and the unusual, while cases with broader consequences or that happen more routinely are neglected. * * * Our study suggests that audiences can gain some knowledge of the judicial process through the media, especially newspapers. However, they are likely to learn about the most unusual cases that have the least significance to the community or the public.

*Id.* at 26 (citing C. Danielle Vinson & John S. Ertter, *Entertainment or Education: How Do the Media Cover the Courts?*, 7 Harv. Int'l J. Press/Politics 80, 94-95 (2002)).

The Committee further expressed particular concern regarding the coverage of sentencing proceedings:

[S]entencing proceedings are the most vulnerable to commercial exploitation, largely at the expense of victims of the violent crimes to which the media devotes the most attention. By their nature, sentencing hearings are emotional affairs. For the first time in the case, the judge, the jury in a capital case, and the general public are permitted to hear heart rending victim impact testimony, including medical and psychological information and testimony from family members and survivors of the victims. Rules of evidence are also relaxed for defendants at sentencing hearings, and they are also permitted to offer testimony regarding highly personal and often traumatic details of their lives in an effort to mitigate the sentence or establish their prospects for rehabilitation.

*See* Braverman et al., *supra*, at iv-v. The Committee determined that sentencing proceedings are not legal matters of public concern and, from the standpoint of public education, may be the least informative of all criminal proceedings because such intimate details typically consist of "nothing of interest to the general public beyond that of prurient voyeurism." *Id.* After its review of the relevant information, including oral and written testimony from the public, the Committee unanimously concluded that the current statutory ban on cameras in criminal trial courts in Maryland should remain in effect. *Id.*

The findings in Maryland are consistent with what little we know about our experience in Minnesota. For example, in 2011, the court approved a two-year pilot program that permitted cameras in courtrooms in civil proceedings with the consent of the trial court judge alone. At the conclusion of that pilot program, the Advisory Committee on the General Rules of Practice filed a status report with the court discussing the results of the program. The Advisory Committee concluded that "[t]he most striking aspect of the impact of the Court's 2011 Order has been the paucity of requests for camera coverage in the trial courts." *Recommendations of the Minn. Supreme Ct. Advis. Comm. on Gen. Rules of Prac.*, No. CX-89-1863, Final Rep. at 3 (Oct. 1, 2013). The

D-6

Advisory Committee found that over the two-year period, the media made approximately 20 requests to cover civil proceedings.[1] *Id.* Calling this amount of coverage "anemic," the Advisory Committee also determined that "Minnesota's experience appears not to be unusual." *Id.* at n.3. Such lackluster interest from the media in civil proceedings suggests that the media's true intent is covering only the most notorious cases. In other words, if the proponents are correct—that expanded camera access is primarily about advancing public education—then relaxing the camera restrictions in civil proceedings should have resulted in the media covering significantly more matters. But it did not.

The court counters by asserting that I "ignore[] the purpose of the pilot project: to gather data that will assist us in fairly evaluating the asserted benefits and potential consequences of electronic courtroom coverage in certain Minnesota criminal proceedings." While data gathering is ostensibly the purpose of pilot programs, it is the court that ignores the fact that "camera" pilot programs have persisted in this state for nearly 30 years,[2] and during that time have produced little in the way of meaningful data. The data that has been produced suggests that any benefit from permitting cameras in our courtrooms will inure to media outlets while working to the disadvantage of due process and justice.

---

[1]    Of those requests, approximately half resulted in some electronic coverage being allowed. *Recommendations of the Minn. Supreme Ct. Advis. Comm. on Gen. Rules of Prac.*, No. CX-89-1863, Final Rep. at 3 (Oct. 1, 2013).

[2]    In 1983, we approved the first pilot program allowing audio and video coverage in trial courts so long as all of the parties consented. That program expired in 1987. Then, in 1989, we reinstated the 1983 pilot program, which was allowed to continue until 2011. Finally, in 2011, we approved a 2-year pilot program permitting cameras in courtrooms in civil proceedings with the consent of the trial court judge alone.

II.

In addition to the fact that the alleged benefits of electronic media coverage are illusory, the court also ignores the damaging consequences of expanding the use of cameras in our courtrooms. One such effect relates to witnesses who feel nervous or who refuse to testify before cameras. *See* Nancy S. Marder, *The Conundrum of Cameras in the Courtroom*, 44 Ariz. St. L.J. 1489, 1510 (2012). In 2005, Judge Jan DuBois, who participated in the FJC pilot program, expressed concern before the Senate Judiciary Committee that 64% of the judges participating in the FJC pilot program found that cameras made witnesses more nervous; 41% of the judges found that cameras led to witnesses who were distracted; 46% of judges thought the cameras made witnesses less willing to appear; and 56% of the judges found that the cameras violated witnesses' privacy. *Cameras in the Courtroom Act of 2005: Hearing on S. 829 Before the S. Comm. on the Judiciary*, 109th Cong. 14 (2005) (statement of Jan E. DuBois, Judge, U.S. District Court for the Eastern District of Pennsylvania). There is nothing to suggest that the Minnesota experience will be any different.[3]

---

[3] The court cites the Maryland Committee Report, Braverman et al., *supra*, at viii, to support its assertion that "the experiences of other jurisdictions show that the 'adverse impacts [of camera coverage] on witnesses and jurors are not universal.' " (Quoting Braverman et al., *supra*, viii.) While it may be true that the adverse impacts of camera coverage on witnesses and jurors are not "universal," the court misses the point. An adverse impact on trial participants need not be "universal" to create an unacceptable risk of harm to the criminal justice process. Notably, the Maryland Committee reached this very conclusion, unanimously recommending that the ban on cameras in criminal trial courts continue, notwithstanding the Committee's observation that adverse impacts are "not universal." *Id.* at i, 50. Similarly, after a 3-year federal pilot program for civil cases, the Federal Judicial Conference declined to permit camera access to federal civil proceedings because "the *potentially* intimidating effect of cameras *on some* witnesses

Moreover, in 2008, our Advisory Committee on General Rules of Practice explained:

> Even if cameras were limited to prevent their use in particular categories of cases . . . crime victims and witnesses, and other interested parties, would be deterred from reporting crimes or from agreeing to testify. This is a significant problem that cannot be readily mitigated; the mere fact that camera coverage of court proceedings is generally known to exist is, according to witnesses before the committee, likely to cause crime and domestic abuse victims and witnesses to decline to report crimes and to refuse to come forward to testify. This chilling effect on victims and witnesses occurs even in types of cases where cameras are not likely to be allowed, as the victims or witnesses would have the impression that being in court subjects one to camera scrutiny.

*Recommendations of the Minn. Supreme Ct. Advis. Comm. on Gen. Rules of Prac.* CX-89-1863, Final Rep. at 7 (Mar. 31, 2008).

This phenomenon is especially disconcerting in the context of gang-related offenses and trials. In a 2007 survey of more than 600 teens from high-crime Massachusetts neighborhoods, more than two-thirds of the survey participants mentioned fear of retaliation as the primary reason why their classmates and neighbors fail to report gang crimes to authorities. National Center for Victims of Crime, *Snitches Get Stitches: Youth, Gangs, and Witness Intimidation in Massachusetts* 25 (2007).[4] For many citizens in a number of communities, the risk run by cooperating with law enforcement is real,

---

and jurors was cause for considerable concern in that it could impinge on a citizen's right to a fair and impartial trial." Statement of Hon. John R. Tunheim, Judge, United States District Court for the District of Minn., on behalf of the Federal Judicial Conference, *H.R. Jud. Comm. Hearing on H.R. 2128*, 110th Cong. (Sept. 27, 2007) (emphasis added).

[4] This report is available online at http://victimsofcrime.org/docs/Root/Snitches%20FINAL.pdf?sfvrsn=0.

and expanded camera usage in criminal proceedings will unnecessarily increase that risk and prevent even more witnesses from coming forward with testimony.

Another effect is the impact that the expanded use of cameras in our trial courts would have on people of color who use our judicial system. In my 2009 dissent, I concluded that the expanded use of cameras would exacerbate racial bias in our judicial system. This point bears repeating as studies continue to indicate that the media consistently portrays African Americans who are accused and/or convicted of crimes in a more negative light than their Caucasian counterparts. For example, analyses of television news indicate that African American males are overrepresented as perpetrators and underrepresented as victims, compared to their Caucasian male counterparts. Dana Mastro et al., *The Influence of Exposure to Depictions of Race and Crime in TV News on Viewer's Social Judgment,* 53 J. Broad. & Elec. Media 615, 616 (2009). In the surveyed news stories, African American suspects were more likely than Caucasians to be portrayed as nameless, menacing, and in the grasp of the police. *Id.* Further, even the text of crime-related news stories has been found to vary depending on the race of the perpetrator. *Id.* For example, research reveals that statements containing prejudicial information about criminal suspects, such as prior arrests, were significantly more likely to be associated with African American (as opposed to Caucasian) defendants, particularly in cases involving Caucasian victims. *Id.*

More recent studies have continued to show that television news gives disproportionate coverage to crime stories involving African American suspects. According to averages of arrest statistics from the New York City Police Department for

the past four years, African Americans represented 54% of murder arrests, 55% of theft arrests, and 49% of assault arrests. Daniel Angster & Salvatore Colleluori, *New York City Television Stations Continue Disproportionate Coverage of Black Crime* (Mar. 23, 2015, 9:34 AM).[5] But between August 18 and December 31, 2014, 74% of murders, 84% of thefts, and 73% of assaults covered by the four major broadcast television stations in New York City involved African American suspects. *Id.* Similar data has been collected in other regions. *See* Travis L. Dixon & Daniel Linz, *Overrepresentation and Underrepresentation of African Americans and Latinos as Law-breakers on Television News*, 50 J. Comm. June 2000, at 144 (a random sample of local television news programing in Los Angeles and Orange Counties showed that African Americans were presented as the perpetrators on television 37% of the time but represented only 21% of arrests); Trina T. Creighton et al., *Coverage of Black Versus White Males in Local Television Lead Stories*, 4(8) J. Mass Commc'n Journalism 216, at 4 (2014) (a study of news coverage by Omaha's four local television affiliates over a 3-month period in 2012 showed that 69% of crime-related lead stories featured an African American male as the perpetrator, while African American males represented only 39% of arrests over the same time period).[6]

---

[5]    Study available online at: http://mediamatters.org/research/2015/03/23/report-new-york-city-television-stations-contin/202553.

[6]    Study available online at: http://omicsgroup.org/journals/coverage-of-black-versus-white-males-in-local-television-news-lead-stories-2165-7912.1000216.pdf.

In an analysis of the effects of race and reporting, communications professors have explained that consuming reporting that over-represents African American crime can have a negative effect on the perception of African Americans as a group:

> [C]onsuming the persistent overrepresentation of Black males in crime-related news stories strengthens the cognitive association between Blacks and criminality in the mind of consumers such that the connection (i.e., Blacks and crime) becomes chronically accessible for use in race-related evaluations. Notably, as the research on media priming illustrates, even a single exposure to these unfavorable characterizations can produce stereotype-based responses.

*See* Mastro, et al., *supra*, at 616.

Professors Robert M. Entman and Andrew Rojecki, who analyzed various forms of television programming to determine how the perception of African Americans is affected by their portrayals on television, explain that the "accumulated impression from these images is that race alone suffices for comprehensive identification of criminals – that being African American is almost tantamount to guilt." Robert M. Entman & Andrew Rojecki, The Black Image in the White Mind: Media and Race in America 8 (2000).

The court claims that irresponsible media coverage and prejudice will occur with or without camera use in criminal proceedings, but it does not follow, as noted previously, that the judiciary should play a role in facilitating such coverage and prejudice. This is especially true when the purported benefits of allowing cameras in our courtrooms are, at best, speculative and, at worst, nonexistent.

For these reasons, I respectfully dissent.